UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

v.                                                                          Case No. 3:16cr001/MCR

TRENTON S. SOMMERVILLE

_____/

### ORDER

This matter is before the court for a determination of the amount of restitution that is due to the victims of the wire fraud scheme for which Defendant Trenton S. Sommerville has been convicted. Having fully considered the evidence and the parties' arguments, the court finds that Defendant owes **$2,286,240.00** in restitution to the victims.

**BACKGROUND**

Between January 1, 2011 and December 31, 2014, Defendant solicited and accepted money from investors to provide capital that he represented would be used in various investment opportunities he offered. More specifically, Defendant solicited funds from investors in the following entities or ventures over which he had control and signatory authority: (a) Concordis Group, Inc., a captive insurance company whose shares were publicly traded "over the counter"; (b) Aleato Gaming, Inc., which offered limited partnerships in slot machine ventures located in the

Caribbean; (c) Four Kings Gaming, Inc. and Four Kings Club, Ltd., doing business as King of Clubs, a company existing for the purpose of building a gambling casino in Trinidad; and (d) Playmaster, Inc. and Playmaster N.V., a company existing for the purpose of operating a lottery in St. Maarten.  Defendant also did business using the entities First Capital Partners, Inc. and IGE, over which he also had control and signatory authority.  Defendant made materially false representations to potential investors about having secured the requisite licenses to operate gambling facilities in Trinidad and St. Maarten, about the status and profitability of the gambling projects there, about the returns their investments would generate, and about the amount of investor capital that would actually be used to develop and grow the various business ventures.  In truth, Defendant misappropriated much of the investment capital he received to pay for personal living expenses, personal property, and personal debts.  At no point did Defendant disclose to the victims that he would use their funds for these purposes.  ECF No. 7 at 2.

On January 21, 2016, Defendant and the Government entered into a plea agreement, pursuant to which Defendant entered a plea of guilty to a two-count information charging him with tax evasion, in violation of 26 U.S.C. § 7201, and wire fraud, in violation of 18 U.S.C. § 1343.  ECF Nos. 6, 10.  Defendant's guilty plea was accepted, ECF No. 13, and on June 24, 2016, the court imposed sentence, ECF No. 32.  The court reserved ruling on the issue of victim restitution.  A

restitution hearing was conducted on September 20, 2016. At the hearing, the Government relied on information in the Presentence Report, the evidence presented at the sentencing hearing, testimony by IRS special agent Christopher Pekerol as to the victims' loss amounts, and information submitted by a number of victims during law enforcement interviews and in their FBI Questionnaires and victim impact statements. Defendant offered testimony from Mike Medlin, the former general manager and operations director for Four Kings Gaming, Inc., who described Defendant's efforts to actualize different gambling projects in the Caribbean while Medlin was involved. With the benefit of this evidence and the parties' arguments, the court found that restitution was required in this case, but took the matter of amount under advisement. ECF No. 44.

**DISCUSSION**

The parties dispute the amount of restitution that should be awarded. The Government seeks restitution in the amount of $2,753,940, which represents the entire amount invested with Defendant during the relevant time period by each individual whose investment could be independently verified through bank records. Defendant contests this amount, arguing that restitution should be limited to the amount of investor funds that he used for personal expenses without notifying investors.

The Mandatory Victim Restitution Act (MVRA) requires a district court to award restitution to identifiable victims of offenses involving fraud and deceit, such as wire fraud. 18 U.S.C. § 3663A(c)(1); *United States v. Martin*, 803 F.3d 581, 593 (11th Cir. 2015). A court must "order restitution in the full amount of each victim's losses," without regard to the defendant's ability to pay. 18 U.S.C. § 3664(f)(1)(A). The determination of the restitution amount "is by nature an inexact science," but courts must engage in an individualized, fact-specific inquiry into the actual losses of each victim. *United States v. Huff*, 609 F.3d 1240, 1248-1250 (11th Cir. 2010) (explaining that a "district court must make specific factual findings of whether the victim suffered a loss and the amount of those actual losses") (internal quotation marks omitted). The Government has the burden of proving by a preponderance of the evidence the type and amount of loss sustained by a victim as a result of the defendant's offense. 18 U.S.C. § 3664(e); *United States v. Bane*, 720 F.3d 818, 828 (11th Cir. 2013).

Restitution is plainly required here, as Defendant pleaded guilty to wire fraud and that fraud caused direct pecuniary harm to a number of victims. For restitution purposes, a "victim" is any "person directly and proximately harmed as a result of the commission" of the defendant's offense. 18 U.S.C. § 3663A(a)(2). In other words, there must be a direct, causal link between the charged offense and the loss to the victim. *United States v. Ledesma*, 60 F.3d 750, 751 (11th Cir. 1995). Thus,

to prove that an individual is a victim for purposes of restitution in this case, the Government must show: (1) that a particular loss would not have occurred "but for" the Defendant's materially false or fraudulent representations and (2) that "the causal connection between [Defendant's] conduct and the loss is not too attenuated (either factually or temporally)." *See United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (quoting *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002)). This standard reflects the Supreme Court's admonition that restitution awards are limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990) (interpreting the language "direct and proximate cause" in the Victim and Witness Protection Act of 1982).

Based on the evidence presented at the sentencing and restitution hearings, as well as the information submitted by the victims in their interviews, questionnaires, and victim impact statements, the court finds that the Government has shown by a preponderance of the evidence that Defendant's false or fraudulent representations were the direct and proximate cause of compensable losses to the following victims in the amounts shown:

| | |
|---|---:|
| Bruce Ai | $100,000 |
| Simoneaux Jude Alexander | $3,000 |
| Guiseppe Consarino | $110,000 |
| Adam Cromwell | $108,000 |
| George and Vauna Cromwell | $30,000 |
| Richard Doyle | $10,000 |
| Mark C. Foster | $112,500 |
| Eric Gravatt | $20,000 |
| Shelly Harrington | $30,000 |
| Dinesh Hebbar | $38,000 |
| Terry Ryan Jamison | $10,000 |
| Vicki Johnson | $7,500 |
| Jijo John | $18,000 |
| Karen Kiewatt | $12,500 |
| Wayne A. LeBlang | $87,000 |
| Gregory Lehn | $50,000 |
| Andrew Oxendine | $15,000 |
| Norman Patt | $404,740 |
| Jason Payne | $10,000 |
| Ty Pennington | $1,000,000 |
| William Perry | $55,000 |
| Steve Sinn | $12,500 |
| George Tombe | $7,500 |
| Guy Useldinger | $35,000 |
| **Total:** | **$2,286,240** |

The evidence with respect to the above victims showed that their decisions to invest were based, in large part, on materially false or fraudulent representations and promises made by Defendant to each of them about various aspects of his business operations in the Caribbean.[1]  Moreover, most of the above victims reported that

---

[1] *See, e.g.*, ECF Nos. 24-1 at 4 (Defendant represented that the casino was a "turnkey investment opportunity" with its "grand opening" to occur within months); 24-3 ("I was supposed to get 10x returns starting from 3 months of the operation."); 24-4 at 55 (Defendant "was the only person who had license for online lottery and [ ] his license was similar to the Canadian

they never authorized Defendant to use any portion of their investment for personal living expenses and, had this fact been disclosed, they never would have invested.[2] Based on these victims' specific accounts of their experiences with Defendant, the court is able to conclude that Defendant made deceptive and misleading statements in order to induce their investments, which he knew at the time to be untrue. Accordingly, the court finds that the Government has met its burden of proving that the above victims suffered direct and proximate losses as a result of Defendant's criminally fraudulent scheme.

The court finds, however, that the Government has not satisfied its burden of proving by a preponderance of the evidence that the following fourteen individuals qualify as "victims" of Defendant's crime for purposes of restitution under the MVRA:

---

government's online lottery."); 24-5 at 24 ("[P]romises were made regarding progress that never occurred."); 30-2 at 83 (Defendant promised "to return all capital by December 31, 2014."); 30-4 at 81 (Defendant said that he "owned gaming licenses and casino buildings, and he was raising funds to purchase slot machines to put in his casinos."); 30-7 at 13 (Defendant said "he never took any money for himself, not one dime."); 40-2 at 60 (Defendant "assured me that dividends would begin to be paid within 3 months."), 77 (Defendant said that "he absolutely had a license to operate a casino, and not just a restaurant or business, in Trinidad.").

[2] *See* ECF Nos. 24-2 at 10, 18; 24-4 at 55; 24-5 at 23; 30-1 at 78; 30-2 at 14, 83, 140; 30-3 at 29; 30-4 at 7, 80, 101; 30-5 at 105; 30-6 at 4; 30-7 at 9; 30-8 at 28; 40-2 at 3, 77.

| | |
|---|---:|
| Tyler Amunrud | $7,500 |
| Cecil Bateman | $8,000 |
| Brad R. Edwards | $30,000 |
| Jamie S. Greenwood | $10,000 |
| John Hayes | $4,000 |
| Henry W. McMillan, III | $50,000 |
| George H. and Harriett K. Moore | $5,000 |
| Michael O'Leary | $145,000 |
| William G. Plueckhahn | $20,500 |
| James G. Reuss | $29,700 |
| Eric Stephens | $50,000 |
| Wayne Troyer | $7,500 |
| Thomas C. Weekly | $88,000 |
| David J. Welch | $12,500 |
| **Total:** | **$467,700** |

The Government has shown that these individuals invested significant sums in Defendant's captive insurance or gambling ventures during the relevant time period and that each individual lost virtually all of that investment, suffering considerable collateral harms as a result. But the Government has failed to prove that these individuals' losses were "directly and proximately caused" by the Defendant's materially false or fraudulent representations. Both the court and the Probation Office combed the record for evidence of specific misrepresentations made by Defendant to these fourteen individuals.[3] None were found. This is not to

---

[3] The Government's presentation – at sentencing, during the restitution hearing, and in its multiple filings – neglected to directly address the dispositive question of what specific false or fraudulent representations were made to individual victims in order to induce their investments. Consequently, the court and the Probation Office performed separate, detailed examinations of the entire record to ascertain, to the extent possible, whether such misrepresentations had in fact been made.

Case No. 3:16cr001/MCR

say that these individuals were not deceived or misled by Defendant. Several of them indicated on their victim impact statements that they were "constantly lied to," ECF No. 30-4 at 87, or were, understandably, "upset over [Defendant's] greed and dishonesty," ECF No. 24-1 at 8.[4] These statements, however, are not specific enough to support an inference that Defendant's criminal conduct induced these individuals to invest. Most of these individuals' submissions are silent on the matter of loss causation, which is troubling because it means that this might have been a much more fruitful exercise for potential victims had the Government properly phrased its questions to elicit the specific misrepresentations that were made to each. It is impossible for the court, based on the record before it, to determine, as it must, what precise misstatement or untruth each of these fourteen individuals was told or what particular deception they were exposed to, if any. The Government, therefore, has not met its burden to show that these individuals were "directly and proximately harmed as a result of" Defendant's wire fraud. *See* 18 U.S.C. § 3663A(a)(2).

Defendant's actions in this case severely impacted the lives of many people, a number of whom shared their experiences through law enforcement interviews, FBI Questionnaires, or victim impact statements. Some investors described how this experience wiped out or seriously depleted their life savings and retirement

---

[4] *See also* ECF No. 24-6 at 4 (Investor "wrote check on promises made which were false.").

Case No. 3:16cr001/MCR

accounts.[5] Other investors lost their children's college tuition money or were left with crippling debt.[6] Equally devastating were the non-economic effects. Many of the investors suffered physical and emotional strains from the realization that they had been defrauded out of such large sums of money.[7] Some discussed the toll that this experience inflicted on their marriages and families.[8] The court is mindful of the pain and hardship that Defendant's actions have caused; however, the Government must be held to its burden of proving the amount of each loss that was caused by Defendant's *criminal* conduct. *See Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014). Failing in a business venture is not a crime, and the evidence

---

[5] *See* ECF Nos. 24-1 at 10 (Investor "used life savings"); 24-2 at 46 ("I had to borrow money from my family and live in their basement due to financial loss."); 24-3 at 28 (Victim lost "significant portion of our savings"), 55 ("I have been affected by this crime because it was a large portion of our retirement."); 24-4 at 62 ("My husband and I went forward with our retirements and now find ourselves in a very different situation than what we had planned on."); 24-5 at 77 (This is over 25% of my retirement assets! Now, at age 85, I am still working."); 30-7 at 12 ("After [this experience], I had nothing to very little to start all over.").

[6] *See* ECF Nos. 24-4 at 66 (Defendant "swindled my children's college money!"); 24-4 at 69 ("I may have to vacate my rental residence in one year or so, which I planned to be in for my life."); 40-2 at 60 ("This has caused hardship on our family because we have needed money for medical bills, kids' weddings, car repairs, college tuition, and daily expenses. We have accrued debt that wouldn't have been necessary.").

[7] *See* ECF Nos. 24-2 at 46 ("As a result [of this fraud], I suffered mental anguish which greatly affected my performance at my job."); 24-4 at 66 ("I have had anxiety and stress since becoming involved with [Defendant]."); 24-6 at 47 ("This is a great embarrassment for me."); 40-2 at 61 ("The financial stress has caused health issues for my husband.").

[8] *See* ECF Nos. 24-1 at 6 (Defendant's actions "have taken a tremendous toll on my entire family" and "shaken our faith in the justice" system); 24-2 at 12 ("This crime has caused major stress on my marriage. My relationship with a good friend – also an investor in this situation – has been compromised and caused a great deal of hurt."); 24-3 at 1 ("My ex-wife constantly put me down for being so gullible and stupid, which is exactly how I felt. This is one of the reasons we divorced in 2015."), 28 ("[T]his loss [ ] was one key variable that aided in my separation in June of 2012 and subsequent divorce in June of 2013.").

presented at the restitution hearing reflects at least some effort by Defendant to put casinos and gambling parlors in place in the Caribbean.  The court simply does not have the factual record before it to support a restitution award encompassing the entirety of the investors' losses.

Accordingly, the Clerk of Court is directed to enter an Amended Judgment that orders restitution in the amount of **$2,286,240**, payable to the victims identified on Page 6 of this Order, in the amounts there shown.

**SO ORDERED** this 11th day of October, 2016.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**